KUNTZ, J.

ORIGINAL

CV 20 - 810

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 11 2020 ★

BROOKLYN OFFICE

# IN THE UNITED STATES DISTRICT
# FOR THE EASTERN DISTRICT OF NEW YORK

---

### DANIEL E. CARPENTER,



v.

### KATHLEEN HAWK SAWYER

---

## MOTION FOR IMMEDIATE RELEASE TO HOME
## CONFINEMENT, DECLARATORY JUDGMENT, AND
## INJUNCTIVE RELIEF PURSUANT TO THE FIRST STEP ACT

---

Daniel E. Carpenter
Petitioner, *pro se*
Incarcerated Inmate
Reg. # 90792-038
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

DANIEL E. CARPENTER     )
                               )
**v.**                            )
                               )
KATHLEEN HAWK SAWYER   )

## MOTION FOR IMMEDIATE RELEASE TO HOME CONFINEMENT, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF PURSUANT TO THE FIRST STEP ACT

NOW COMES THE PETITIONER, Daniel E. Carpenter (hereinafter "Petitioner" or "Mr. Carpenter") to move this Honorable Court to authorize his immediate release to Home Confinement under the Elderly and Family Reunification for Certain Non-Violent Offenders Pilot Program ("Elderly Offender Program") under the First Step Act (FSA), and should the Bureau of Prisons (BOP) not agree with this Court's interpretation of the clear congressional mandate set out in the FSA, to then order Petitioner's immediate release pursuant to its injunctive powers to enforce the will of Congress and the laws of the United States as adopted in the FSA. This Motion is necessary based on hearings held on Thursday October, 17 2019, where the newly-appointed Director of the BOP Kathleen Hawk Sawyer stated that the implementation of the FSA is working well everywhere except for New England, all while Representative David Cicilline (D-RI) peppered her with questions as to why no one seems to be getting Halfway House time, Home Confinement time, or even the seven days of Good Conduct Time (GCT) as promised by the FSA's Elderly Offender Program.

Since those hearings, and without warning or any notice, Petitioner was shipped out of the Camp at FMC Devens the day before Thanksgiving to the Maximum Security facility at MDC Brooklyn, which is an hour farther from his home rather than Watkinson House in Hartford

Connecticut, which is the BOP facility closest to his home pursuant to his request under the FSA. Now that the Attorney General and the BOP have stated that the FSA has been fully implemented (See, e.g., various Press Releases from January 15th and 17th), someone needs to explain to Director Hawk Sawyer and the Attorney General that the BOP rank-and-file are not just ignoring the FSA, they are doing their level best to sabotage and scuttle the FSA. Petitioner has witnessed this first hand both at FMC Devens and now at MDC Brooklyn, where dozens of inmates in the elite Cadre program at MDC Brooklyn have been waiting for months to get their new dates for both Halfway House and Home Confinement under the FSA. Petitioner has sent emails over the BOP's Corrlinks system to volunteer to be a "whistleblower" for Director Hawk Sawyer, but he has received no reply.

Petitioner believes that he has served his full sentence based on the Elderly Offender Program. This is, in fact, a large part of the reason for the passage of the FSA: to have elderly offenders with medical needs like Petitioner be under Home Confinement rather than in a Camp or a Halfway House. Certainly Petitioner should not have been sent from the Camp at FMC Devens to a Maximum Security facility like MDC Brooklyn, which is actually further away from Petitioner's home in Connecticut. Instead, he should have been sent directly to Home Confinement under the BOP's own Program Statements, or at the very least, to the Watkinson House in Hartford, Connecticut, which is only 20 minutes from Petitioner's home and therefore is clearly the closest BOP facility as required under the specific mandates of the FSA.

Petitioner has sent three separate requests to the Warden at FMC Devens (and at Brooklyn) to serve the remainder of his sentence at Watkinson House in Hartford because it is the closest BOP facility to his home. Watkinson House is also down the street and easy walking distance to St. Francis Hospital, which is the hospital that all of Petitioner's doctors are affiliated with. Instead

3

of being sent to Home Confinement or to Watkinson House, Petitioner was transferred without notice or warning to MDC Brooklyn, which is actually farther away from Petitioner's home and is a Maximum Security facility not suitable for a "Camper" like Petitioner. It would have made more sense to send Petitioner to FCI Danbury, which is a Low Security facility and is in Connecticut.

Petitioner wishes to state at the outset that he has the utmost respect for Director Hawk Sawyer, because she wrote the regulations and Program Statements (such as 7310.04, 7320.01, and 7300.09) that he will be referring to when citing such famous cases as *Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004), *Iacoboni v. United States*, 251 F.Supp.2d 1015 (D. Mass. 2003), *Monahan v. Winn*, 276 F. Supp. 2d 196 (D. Mass 2007), and *Putnam v. Winn*, 441 F.Supp.2d 253 (D. Mass. 2006). As a camp-qualified inmate, Petitioner finds himself in a maximum security cell in locked quarters where his cell has been locked several times due to periodic lockdowns caused by violence at MDC Brooklyn, and the emergency buzzers do not work in his cell. Instead, Petitioner should be placed on Home Confinement, or at worst, at the Watkinson House in Hartford, which is a BOP Halfway House facility closer to his home under the FSA and is literally within walking distance to St. Francis Hospital where his doctors are, and if there were an emergency he could receive life-saving treatment immediately.

Petitioner was at the Camp at FMC Devens until he was suddenly and unexpectedly transferred to MDC Brooklyn, where he is in a cell in one of the most notorious maximum security facilities in America rather than the Camp at Otisville or Devens like the district judge recommended in Petitioner's Judgment and Commitment Order. No reason has been given or found for Petitioner's sudden and unexpected transfer, and there is no BP-409 Form in his file explaining the reason for his transfer as required by law and the BOP's own regulations. Therefore, Petitioner

seeks his immediate release to Home Confinement for the reasons described below, all of which are provided to the Court by Petitioner under the penalty of perjury pursuant to Section 1746.

## I. PRELIMINARY STATEMENT

With the First Step Act of 2018 (FSA), Congress has amended the rules so that an inmate can seek recourse to the courts after thirty days if the Warden of the prison has not responded to the inmate's written requests. *See, e.g., United States v. Cantu,* 2019 WL 2498923 at *1 (S.D. Tex. June 17, 2019). Petitioner's letters to the Warden were dated April 9 and May 22, 2019, and there has been no response. Petitioner has also sent several emails to the Warden at MDC Brooklyn, as well as Director Hawk Sawyer, on the BOP's Corrlinks System. None of these requests has received a reply, and more than 30 days has passed on all of these requests. Therefore, this Court clearly has jurisdiction to adjudicate Petitioner's motion and grant the relief Petitioner seeks.

On the Monday before Thanksgiving, November 25, 2019, Mr. Carpenter was called to the office at the Camp at FMC Devens and told to pack his belongings as if he was not coming back. When Mr. Carpenter asked what it was about the CO said he did not know but "they want you up there at 8:30 that morning." Mr. Carpenter hurriedly packed his things and was kept in the SHU for the next two days before enduring a nine hour bus ride to MDC Brooklyn. At no time was he told that he was going to Brooklyn or if that was his final destination. Nor was Mr. Carpenter allowed to contact his wife or his attorneys to let them know what was going on. It was not until Thanksgiving Day itself that Mr. Carpenter was able to phone his wife.

While in the SHU at FMC Devens, the medical PA that knew Mr. Carpenter from the Camp was kind enough to take his Blood Pressure reading three times, because he had monitored it the week before Mr. Carpenter was sent to the SHU. Those readings in the SHU were consistent with the readings the week before. They were all 190/100, which is extremely dangerous. In fact, the

Wall Street Journal has been running ads from the AHA that encourage everyone to get their blood pressure checked by showing a woman who had scars from her heart surgery because she had suffered a heart attack but only had 182/100 blood pressure, lower than Mr. Carpenter's. Mr. Carpenter has been under the care of physicians affiliated with St. Francis Hospital for his blood pressure and other issues, and has been under several medications continually at FMC Devens and here at MDC Brooklyn. In fact, that was the reason for Mr. Carpenter to request a transfer to Watkinson House under the FSA, because a Halfway House and Home Confinement is the same security level as a Camp. In fact, according to the First Circuit in *Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004), which is cited by the Second Circuit in *Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006), there is no custody level difference between Mr. Carpenter being at the Camp at Devens, Watkinson House close to St. Francis Hospital, or being on Home Confinement. The BOP has made a major constitutional error by shipping Mr. Carpenter to a maximum security prison that is farther away from his family after Mr. Carpenter requested a transfer closer to home to Watkinson House under the FSA..

Under the FSA, Mr. Carpenter's 30 month sentence under the Elderly Offender Program of the First Step Act is now 20 months at a Camp and 10 months of Home Confinement under the BOP's Custody. But, from the 20 months of incarceration, Mr. Carpenter is also entitled to 135 days of Good Conduct Time (GCT) Credits. Even if the BOP uses the calculation under H.R. 4018 for calculating the two-thirds date, because Mr. Carpenter reported to FMC Devens on March 22, 2019, his new two-thirds date for mandatory release to Home Confinement is August 20, 2020 instead of November 2020. This is significant because under the old law of the Second Chance Act of 2007 as codified in 18 U.S.C. §3624(c) and as amended by the FSA, everyone is entitled to 12 months of Halfway House and 10% of their sentence on Home Confinement to get them back

6

into the community. Home Confinement is now guaranteed under the FSA as it states "shall" and is no longer up to the BOP's discretion. The FSA makes the 10% mandatory for Home Confinement, so that means another 3 months off, which means Mr. Carpenter's release date is May 20, 2020. But, if Mr. Carpenter receives only 3 months of Halfway House, that means his release date to Home Confinement should be February 20, 2020. If he receives 4 months (much less than the 20% given out to other people at MDC Brooklyn) then his release date should be January 20th, because as of January 20th he will have served 10 months with 2 months in a maximum security prison.

Mr. Carpenter has not seen the Sun since his bus ride to Brooklyn on November 27th. Having Petitioner on Home Confinement would clearly save the American taxpayers money, which is what the FSA is all about. For that reason alone, this Court should order his immediate release to Home Confinement pursuant to the First Step Act. Moreover, under the FSA, the new §3624(g)(10) makes it very clear that there is no longer any limit under §3624(c) for placing an inmate under Home Confinement. Therefore, the intent of Congress is clear, and this Court should order Mr. Carpenter to be immediately released to Home Confinement rather than remain in a Maximum Security prison that he never should have been sent to in the first place as an Elderly Offender under the FSA.

## II. PETITIONER SHOULD BE IMMEDIATELY RELEASED TO HOME CONFINEMENT PURSUANT TO THE FIRST STEP ACT

In the bulletins released by Attorney General Barr on January 15th and 17th 2020, the Attorney General emphasized that the BOP has the right, and in fact the duty, to release elderly offenders immediately to Home Confinement pursuant to the FSA:

> The FSA authorizes BOP to maximize the use of home confinement for low risk offenders. Currently, there are approximately 2,000 inmates on Home Confinement. The legislation also expands [the Family Reunification and Elderly Offender Program] for eligible elderly and terminally ill offenders to be transitioned to Home Confinement.

This bolsters the earlier April 4, 2019 Memo from Director Hugh J. Hurwitz:

> Section 602 of the FSA modified 18 U.S.C. §3624(c)(1), authorizes the Bureau to maximize the amount of time spent on home confinement when possible. The provision now states.... "Home confinement authority. – The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. **The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph."** (Emphasis in original). *See* Exhibit One.

It also reflects a study done by the OIG released in November 2016, where the OIG criticized the BOP for not utilizing Home Confinement for nonviolent offenders. In fact, Home Confinement has been the preferred release method over Halfway House since Director Hawk Sawyer wrote the original Regulations and Program Statements over 20 years ago in 1999. This was demonstrated by the BOP's Assistant Director Blake Davis in a Bulletin he drafted to all Wardens in May 2013, that is also attached as Exhibit Two:

> "Accordingly, every effort should be made to consider community placements for inmates with manageable medical and mental health needs. These placements can help mitigate the potential increased recidivism risk of sending an inmate with these needs directly to the community. A community placement provides more expedient access to resources to address the specialized needs of these populations. Staff must take the steps necessary to facilitate these placements. For low need/low risk inmates, home confinement is the preferred pre-release option. This option is currently under- utilized. Program Statement 7320.01, Home Confinement, states supervision under home confinement may be provided by contract halfway house services, U.S. Probation or other government agencies."

Petitioner is requesting to be transferred to Home Confinement or other residential community confinement (RRC, Residential Reentry Center, or Halfway House), under 18 U.S.C. §§3621(b) and 3624(c). The latter statute specifically obligates the director of the BOP to "*ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term...under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community*", and provides at (c)(2) that it "may be used to place a prisoner in Home Confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." These statutes are implemented in BOP Program Statement Nos. 7320.01, CN-1 "Home Confinement" (9/6/95) and 7310.04, "Community Corrections Center Utilization and Transfer Procedures" (12/16/98). Program Statement No. 7320.01 provides that "[h]ome confinement is a time of testing and an opportunity for inmates to assume increasing levels of personal responsibility while providing sufficient restriction to promote community safety and continue the sanction of the sentence." The BOP is required to ensure that each appropriate inmate is placed on Home Confinement as soon as otherwise eligible. Home Confinement is the *preferred placement* for those inmates who have established employment and residency. See attached as Exhibit Three, the Community Contracting Program Statement 7300.09 (January 12, 1998), p. 21 at §31(a), all of which were signed by the current Director of the BOP, Kathleen Hawk Sawyer, when she was the Director of the BOP in 1998.

Furthermore, with the FSA amending §3624(c) to make the 10% of sentence Home Confinement time mandatory, the addition of the new §3624(g)(10) makes it very clear that Congress wanted to eliminate any and all limits on Home Confinement for Elderly Offenders. Petitioner should be on Home Confinement in Connecticut rather than serving his sentence in Maximum Security at MDC Brooklyn. By sending Petitioner to Brooklyn, the BOP has violated

9

both the FSA and Petitioner's constitutional rights. This Court should rectify this constitutional error by ordering Petitioner's immediate release to Home Confinement, even while it awaits a response from the Government.

## III.  CALCULATION OF PETITIONER'S HOME CONFINEMENT DATE PURSUANT TO THE FIRST STEP ACT

Simply put, Petitioner's 30 month incarceration is now meant to be 20 months of incarceration and 10 months of Home Confinement. From the 20 months of incarceration, the FSA also provides 54 days of Good Conduct Time (GCT) credits each year with the final year prorated, so that Petitioner is entitled to 135 days of GCT credits or 4.5 months, meaning that Petitioner's incarceration is now 15.5 months. But, also under the FSA, every inmate is guaranteed up to 10% of their sentence in Home Confinement. This means that Petitioner is effectively guaranteed at least 3 months of Home Confinement pursuant to the FSA, so his time of incarceration is now just 12.5 months by law as specified by Congress in the FSA. But, under the new §3624(c) as amended by the FSA, every inmate **is also** entitled to up to 12 months of Halfway House and Home Confinement, whether they have a sentence of 18 months or 18 years. Additionally, as previously discussed above, the new §3624(g)(10) eliminates any and all limits under §3624(c), so the Warden at MDC Brooklyn has the ability to send *any and all* Elderly Offenders directly to Home Confinement right now under the FSA, especially someone like Petitioner who has clearly served his full sentence based on the FSA and the old law under the Second Chance Act of 2007 as codified in §3624(c).

Since Petitioner entered FMC Devens on March 22, 2019, as of January 20, 2020 he will have served 10 months (and have earned 5 months of Earned Time Credits under the FSA's Earned Time Credit program that began with the date of enactment of the FSA) and therefore is clearly eligible under the Elderly Offender Program for direct transfer to Home Confinement for the

remainder of his sentence right now, or a transfer to Watkinson House (a BOP facility much closer to Petitioner's home pursuant to the FSA), the Halfway House (or RRC/CCC) on Collins Street in Hartford, Connecticut; literally just down the street from St. Francis Hospital which is the hospital that Petitioner's doctors are affiliated with. It makes no sense to keep Petitioner at a Camp, much less in Maximum Security at MDC Brooklyn, when this Court can just as easily put Petitioner in Home Confinement for the remainder of his sentence. In addition to being qualified for Home Confinement under the new §3624(c) and the Elderly Offender Program under the FSA, Petitioner is also entitled to at least 12 months of time served credits pursuant to §3585(b) for the time he spent at Brooklyn MDC and Wyatt prior to and during his trial.

Petitioner's first letter was sent to the Warden at Devens on April 9, 2019 explaining the ramifications of the BOP's Memo on the FSA of April 4, 2019 combined with his credits of up to 12 months pursuant to §3585(b). See Exhibit Four. If this Court gives Petitioner any credit for the 12 months of 2016 spent at trial and post-verdict, then he should be sent to Home Confinement. While he feels entitled to at least 13 months of §3585(b) credits Petitioner realizes that there is a one-month overlap with his previous sentence from December 28, 2015 to January 27, 2016. But, there is nothing that stops Petitioner from receiving credit for the time from January 28, 2016 to January 27, 2017 when Petitioner was released without receiving any Halfway House or Home Confinement from his original sentence in the Boston case. Because the Warden has not replied to any of Petitioner's letters, this Court has jurisdiction to grant Petitioner the relief that he requests, which is to order his immediate release from prison to Home Confinement immediately as required by the First Step Act and the BOP's own Program Statements and Regulations.

Moreover, Petitioner sent yet another letter sent to the Warden on May 22, 2019 (see Exhibit Five) explaining his health issues and his qualification under the Elderly Offender

Program. Petitioner sent several other letters to the Warden at FMC Devens, one of which the Warden picked up personally when Petitioner was in the Segregated Housing Unit (SHU) at FMC Devens. Suffice it to say, the Warden at Devens never responded to *any* of Petitioner's letters, and Petitioner need only send *one* letter to invoke the jurisdiction of this Court after 30 days has lapsed. Similarly, the Warden here at MDC Brooklyn has not responded to any of Petitioner's email requests since he arrived on Thanksgiving. Petitioner also sent an email to Director Hawk Sawyer volunteering to be a whistle blower on all of the violations of the First Step Act that Petitioner had seen at FMC Devens, so the Director could understand that the rank-and-file of the BOP are trying their best to scuttle the FSA. To date, there has been no response from Director Hawk-Sawyer or Warden Edge of MDC Brooklyn, so once again, this Court clearly has jurisdiction to hear Petitioner's request for relief.

Petitioner further believes that he is entitled to Home Confinement pursuant to §3624(c) because he believes he has 5 months of Earned Time Credits based on the FSA signing date of December 21, 2018 to January 20, 2020. Even assuming that the Earned Time Credits do not start until July 19, 2019, as of January 20, 2020 Petitioner should have at least 3 months of Earned Time Credits as well as his 3 months of Home Confinement time and 6 months of Halfway House time. Also, pursuant to §3624(c) all inmates are entitled to up to 12 months of Halfway House time which the FSA states should also be served as Home Confinement time under the Elderly Offender Program. See Exhibit Six, Petitioner's Enrollment Application for the Elderly Offender Program. Therefore, Petitioner is eligible for immediate release to Home Confinement under the specific mandates in the First Step Act. See Exhibit Seven, Petitioner's Request to transfer to Watkinson House pursuant to the First Step Act

## IV. THE REMEDY FOR THE DUE PROCESS VIOLATIONS IN THIS CASE IS TO ORDER MR. CARPENTER'S IMMEDIATE RELEASE TO HOME CONFINEMENT

The Due Process delays in this case were extraordinary, and the prejudice to Mr. Carpenter was palpable. "[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings." *United States v. Ray*, 578 F.3d 184, 199 (2d Cir. 2009), *citing Doggett v. United States,* 505 U.S. 647, 666 (1992). In *Ray,* in trying to craft a remedy for the Due Process violation for the delay in Ms. Ray's case, the Second Circuit eliminated the need for her to serve any of her custodial sentence or serve her time in a Halfway House and stated the following:

> "The appropriate remedy for a proven due process violation often depends on the stage at which the violation is found and the relief sought. After a due process violation has occurred, courts endeavor to fashion relief that counteracts the prejudice caused by the violation. The Sixth Circuit has stated that suspension of the remainder of the sentence is the appropriate remedy for a due process violation.... The violation of Ray's due process right has prejudiced her insofar as a delayed custodial sentence threatens to undermine her successful rehabilitation. To remedy that harm, the appropriate relief is to release her from any requirement that she submit to a custodial sentence. Accordingly, we conclude that the appropriate remedy in this case is the vacatur of Ray's sentence insofar as it imposes a six-month term of residence in a halfway house." *Ray* at 202-03.

Petitioner should have been credited for his entire time at Wyatt prior to and during his trial, as he has now spent more time in detention in both Brooklyn and Wyatt than the defendant in *United States v. Benatta*, 2003 WL 22202371 (W.D.N.Y. 2003) did, and Benatta had his indictment dismissed for the Due Process violations in his case that were not as great as the overall Due Process violations in Petitioner's case. Not only has Petitioner sent letters to the Acting Director of the BOP and the Warden at Devens, both of which were ignored, his attorneys also sent letters to Paul Irby, the General Counsel of the BOP's Designation and Sentence Calculation Center (DSCC) in Grand Prairie, Texas. Therefore, Mr. Carpenter asks only for the Court to

recognize the Due Process violations in this case and order his immediate release to Home Confinement.

Dismissal of an indictment for the Government's violation of §3161(j) is rare, and in fact it has happened in *Benatta*, despite the holdings in cases such as *United States v. Lainez-Leiva*, 129 F.3d 89 (2d Cir. 1997) where the Court recognized a Due Process violation, but it was not sufficient enough to dismiss the indictment. The reason that the dismissal of the indictment in *Benatta* is so important to Mr. Carpenter's case is that the defendant was suspected by the FBI of being one of the 9/11 terrorists caught at the Canadian Border, and was held at MDC Brooklyn from the time of his indictment (December 12, 2001) to his release to the Immigration Court at the Batavia Federal Detention Facility on April 30, 2002, a delay of only 139 days. Mr. Carpenter is only asking for release to Home Confinement rather than a dismissal of the Indictment, as §3164's only remedy is the release of the defendant. Mr. Carpenter has now spent more time in Maximum Security pretrial at Wyatt and now in Brooklyn since Thanksgiving than a suspected 9/11 Terrorist.

However, the Due Process Delay bullet that the Government cannot possibly dodge is 18 U.S.C. §3161(j)(1), (2), and (3), which provide as follows:

(j)(1) If the attorney for the government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly –

(B) cause a detainer to be filed with the person having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial.

2. If the person having custody of such prisoner receives a detainer, he shall promptly advise the prisoner of the charge and of the prisoner's right to demand trial. If at any time thereafter the prisoner informs the person having custody that he does demand trial, such person shall cause notice to that effect to be sent promptly to the attorney for the government who caused the detainer to be filed.

3. Upon receipt of such notice, the attorney for the government shall promptly seek to obtain the presence of the prisoner for trial. *See Benatta* at \*12-13.

In Mr. Carpenter's case, however, the Government knew that he was sentenced by the Judge in Boston in February of 2014, and his post-trial motions were denied in May of 2014 when the Government in the Connecticut case hit him with a Superseding Indictment with a whole new series of Money Laundering charges, one month before the Government knew that Mr. Carpenter would be reporting to prison on the Boston case. So, while the Government knew they were re-indicting Mr. Carpenter in May 2014 just before he reported to USP Canaan in June 2014, they did absolutely nothing as required under §3161(j). Then, without notifying Mr. Carpenter or his attorneys, they had Mr. Carpenter yanked out of his bunk after lights-out on December 28, 2015 and he was transferred to the same MDC Brooklyn that resulted in the defendant in *Benatta* having his indictment dismissed for only a violation of four months where Mr. Carpenter's §3161(j) violation was over 18 months, and Mr. Carpenter has been held in Maximum Security at both MDC Brooklyn for 60 days and at Wyatt for over 180 days, which is double the amount of time Benatta spent in maximum security.

If a suspected 9/11 terrorist caught at the Canadian Border and held in Brooklyn MDC for only four months was released on Speedy Trial grounds and had his indictment dismissed with prejudice pursuant to §3161(j), then Mr. Carpenter is well within his rights to respectfully request this Court order his immediate release to Home Confinement. Once again, the defendant in *Ray* pleaded guilty to mail fraud, the Government forgot about her, and the district court sentenced her to six months of Halfway House which the Second Circuit reduced to zero to make up for the Due Process Delay. Whereas in this case, the §3161(j) violation is two times greater than *Benatta*, and Mr. Carpenter is owed a 12-month of time-served credits pursuant to §3585(b). So even assuming that Mr. Carpenter was guilty, which he clearly has denied and is still on appeal at the Second

Circuit, he deserves the same Due Process considerations as the defendants in *Ray* and *Benatta*, and they were not owed any credits for time served as is the case for Mr. Carpenter.

## CONCLUSION

For the reasons discussed above, Petitioner respectfully requests that this Honorable Court issue a Declaratory Judgment that Petitioner's sentence has been fully served pursuant to the First Step Act, and to issue an Injunction ordering his Immediate Release to Home Confinement pursuant to the laws of the United States and any other relief that this Court deems just and proper in the interests of justice.

Respectfully Submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
Incarcerated Inmate
Reg. # 90792-038
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

# EXHIBIT

# ONE

 **U.S. Department of Justice**
Federal Bureau of Prisons

OPERATIONS MEMORANDUM
OPI:                    RSD/RRM
NUMBER:             001-2019
DATE:                  April 4, 2019
EXPIRATION DATE:   April 4, 2020

# Home Confinement under the First Step Act

*/s/*
*Approved:* Hugh J. Hurwitz
Acting Director, Federal Bureau of Prisons

The First Step Act of 2018 (FSA) contained additional requirements for the Bureau of Prisons (Bureau) in placing inmates in home confinement generally, and re-established and expanded a pilot program under the Second Chance Act to place elderly and terminally ill inmates in home confinement.

The terms "home confinement" and "home detention" are used interchangeably in this Operations Memorandum.

Institution Supplement. None required. Should local facilities make any changes outside the required changes in the national policy or establish any additional local procedures to implement the national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 1. HOME CONFINEMENT FOR LOW RISK OFFENDERS

Section 602 of the FSA modified 18 U.S.C. § 3621 (c)(1), authorizes the Bureau to maximize the amount of time spent on home confinement when possible. The provision now states, with the new FSA language in bold,

"Home confinement authority. -- The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. **The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.**"

The Bureau interprets the language to refer to inmates that have lower risks of reoffending in the community, and reentry needs that can be addressed without RRC placement. The Bureau currently utilizes home confinement for these inmates. Accordingly, staff should refer eligible inmates for the maximum amount of time permitted under the statutory requirements.

The statutory language will be added to the Program Statement Home Confinement.

## 2. PILOT PROGRAM FOR ELIGIBLE ELDERLY OFFENDERS AND TERMINALLY ILL OFFENDERS

Section 603 (a) of the FSA reauthorized and modified the pilot program conducted under the Second Chance Act, 34 U.S.C. § 60541, as follows:

### (a) Scope of Pilot

The Bureau shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and eligible terminally ill offenders from Bureau facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.

Under 34 U.S.C. § 60541 (h), the pilot will be conducted during Fiscal Years 2019 through 2023.

### (b) Placement in home detention

The Bureau may release some or all eligible elderly offenders and eligible terminally ill offenders from Bureau facilities to home detention, upon written request from either the Bureau staff, or an eligible elderly offender or eligible terminally ill offender.

### (c) Waiver

Under 34 U.S.C. § 60541 (g)(1)(C), the Bureau is authorized to waive the requirements of section 3624 of Title 18 [home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months] as necessary to provide for the release of some or all eligible elderly offenders and eligible terminally ill offenders from Bureau facilities to home detention for the purposes of the pilot program.

### (d) Violation of terms of home detention

A violation by an eligible elderly offender or eligible terminally ill offender of the terms of home detention (including the commission of another Federal, State, or local crime) shall result in the removal of that offender from home detention and the return of that offender to the designated Bureau institution in which that offender was imprisoned immediately before placement on home detention as part of this pilot, or to another appropriate Bureau institution, as determined by the Bureau.

The Bureau will remove an inmate from this pilot in accordance with the Program Statement **Inmate Discipline Program**, and the Program Statement **Home Confinement**.

**(e) Definitions**

The following statutory definitions set out criteria for the implementation of this pilot program only:

**Eligible elderly offender** means an offender in the custody of the Bureau–

    (1) who is not less than 60 years of age;

    (2) who is serving a term of imprisonment that is not life imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16 of Title 18), sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;

    (3) who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in paragraph (2), above.

    (4) who has not been determined by the Bureau, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in paragraph 2 above;

    (5) who has not escaped, or attempted to escape, from a Bureau of Prisons institution (to include all security levels of Bureau facilities);

    (6) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and

    (7) who has been determined by the Bureau to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

**Eligible terminally ill offender** means an offender in the custody of the Bureau who—

    (1) is serving a term of imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16(a) of Title 18, United States Code), sex offense (as defined in section 111(5) of the Sex Offender Registration and Notification Act (34 U.S.C. § 20911(5))), offense described in section 2332b(g)(5)(B) of Title 18, United States Code, or offense under chapter 37

of Title 18, United States Code;

(2) satisfies the criteria specified in paragraphs 3 through 7 included in the Eligible Elderly Offender definition, above; and

(3) has been determined by a medical doctor approved by the Bureau, i.e. Clinical Director of the local institution, to be:

- in need of care at a nursing home, intermediate care facility, or assisted living facility, as those terms are defined in section 232 of the National Housing Act (12 U.S.C. § 1715w); or

- diagnosed with a terminal illness.

**Home detention** has the same meaning given the term in the Federal Sentencing Guidelines as of April 9, 2008, and includes detention in a nursing home or other residential long-term care facility. As with all home confinement placements, the home must be found to be appropriate under the provisions of the Program Statement Home Confinement.

**Term of imprisonment** includes multiple terms of imprisonment ordered to run consecutively or concurrently, which shall be treated as a single, aggregate term of imprisonment for purposes of this section.

**(f) Procedures**

Offenders referred under this pilot shall be processed for home detention utilizing current RRC/Home Confinement procedures.

**For Eligible Elderly Offenders,** a BP-A0210, Institutional Referral for CCC Placement, will be completed. Staff should refer all inmates meeting criteria (1) through (5) in the definition of Eligible Elderly Offender, above. Reentry Services Division (RSD) staff will determine if the inmate meets criteria (6) and (7) under the definition. A clear annotation will be made on the referral packet that **"This inmate is being referred for Home Confinement placement under the provisions contained in the First Step Act for placement of eligible elderly offenders and eligible terminally ill offenders."**

**For Eligible Terminally Ill Offenders,** to include debilitated offenders that may need placement in nursing home, intermediate care facility, or assisted living facility, institution staff will refer the inmate for a Reduction in Sentence (RIS) under Program Statement **Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g).** If not appropriate for a RIS, the Office of General Counsel will provide RSD the RIS packet for consideration under this pilot.

**(g) Reporting and Tracking**

34 U.S.C. § 60541 (g) (4), as amended by the FSA, requires an evaluation of the pilot program, and a report to Congress after its conclusion in 2023. The following data points, at a minimum, will be tracked by RSD to assist with this evaluation and report:

- The number of Eligible Elderly Inmates referred to RSD;
- The number of Eligible Terminally Ill Inmates referred to RSD;
- The number of placements in home detention for each category;
- The length of time of home confinement afforded under each category;
- The estimated amount net reduction of costs to the Federal Government for each case; and
- The estimated amount net reduction of costs to the Federal Government for the pilot period.

## ADDENDUM -- REFERENCED AUTHORITIES

### 18 U.S.C. § 16 -- Crime of violence defined

The term "crime of violence" means--

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*NOTE: 34 U.S.C. § 60541, as amended by the FSA, provides that section 16 (a) and (b) be applied when determining eligibility of an elderly offender; but only section 16 (a) should be applied when determining the eligibility of a terminally ill offender under this pilot.*

Please contact the Office of General Counsel for any questions of whether an offense is a crime of violence under 18 U.S.C. § 16.

### 34 U.S.C. § 20911 (5) -- Relevant definitions, including Amie Zyla expansion of sex offender definition and expanded inclusion of child predators

(A) Generally

Except as limited by subparagraph (B) or (C), the term "sex offense" means--

(i) a criminal offense that has an element involving a sexual act or sexual contact with another;

(ii) a criminal offense that is a specified offense against a minor;

(iii) a Federal offense (including an offense prosecuted under section 1152 or 1153 of Title 18) under section 1591, or chapter 109A, 110 (other than section 2257, 2257A, or 2258), or 117, of Title 18;

(iv) a military offense specified by the Secretary of Defense under section 115(a)(8)(C)(i) of Public Law 105-119 (10 U.S.C. 951 note); or

(v) an attempt or conspiracy to commit an offense described in clauses (i) through (iv).

(B) Foreign convictions

A foreign conviction is not a sex offense for the purposes of this subchapter if it was not

obtained with sufficient safeguards for fundamental fairness and due process for the accused under guidelines or regulations established under section 20912 of this title.

(C) Offenses involving consensual sexual conduct

An offense involving consensual sexual conduct is not a sex offense for the purposes of this subchapter if the victim was an adult, unless the adult was under the custodial authority of the offender at the time of the offense, or if the victim was at least 13 years old and the offender was not more than 4 years older than the victim.

## 18 U.S.C. § 2332b(g)(5)(B) - Acts of terrorism transcending national boundaries

A violation of the following sections of Title 18, United States Code:

32 (relating to destruction of aircraft or aircraft facilities),
37 (relating to violence at international airports),
81 (relating to arson within special maritime and territorial jurisdiction),
175 or 175b (relating to biological weapons),
175c (relating to variola virus),
229 (relating to chemical weapons),
351, Subsections (a), (b), (c), or (d) (relating to congressional, cabinet, and Supreme Court assassination and kidnaping),
831 (relating to nuclear materials),
832 (relating to participation in nuclear and weapons of mass destruction threats to the United States),
842(m) or (n) (relating to plastic explosives),
844(f)(2) or (3) (relating to arson and bombing of Government property risking or causing death),
844(i) (relating to arson and bombing of property used in interstate commerce),
930(c) (relating to killing or attempted killing during an attack on a Federal facility with a dangerous weapon),
956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad),
1030(a)(1) (relating to protection of computers),
1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers),
1114 (relating to killing or attempted killing of officers and employees of the United States),
1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons),
1203 (relating to hostage taking),
1361 (relating to government property or contracts),
1362 (relating to destruction of communication lines, stations, or systems),
1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States),
1366(a) (relating to destruction of an energy facility),
1751(a), (b), (c), or (d) (relating to Presidential and Presidential staff assassination and kidnaping),

1992 (relating to terrorist attacks and other acts of violence against railroad carriers and against mass transportation systems on land, on water, or through the air),

2155 (relating to destruction of national defense materials, premises, or utilities),

2156 (relating to national defense material, premises, or utilities),

2280 (relating to violence against maritime navigation),

2280a (relating to maritime safety),

2281 through 2281a (relating to violence against maritime fixed platforms),

2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States),

2332a (relating to use of weapons of mass destruction),

2332b (relating to acts of terrorism transcending national boundaries),

2332f (relating to bombing of public places and facilities),

2332g (relating to missile systems designed to destroy aircraft),

2332h (relating to radiological dispersal devices),

2332i (relating to acts of nuclear terrorism),

2339 (relating to harboring terrorists),

2339A (relating to providing material support to terrorists),

2339B (relating to providing material support to terrorist organizations),

2339C (relating to financing of terrorism),

2339D (relating to military-type training from a foreign terrorist organization), or

2340A (relating to torture).

A violation of the following sections of Title 42, United States Code:

2122 (relating to prohibitions governing atomic weapons), or

2284 (relating to sabotage of nuclear facilities or fuel).

A violation of the following sections of Title 49, United States Code:

46502 (relating to aircraft piracy),

46504 - the second sentence of the section (relating to assault on a flight crew with a dangerous weapon),

46505(b)(3) or (c) (relating to explosive or incendiary devices, or endangerment of human life by means of weapons, on aircraft),

46506 if homicide or attempted homicide is involved (relating to application of certain criminal laws to acts on aircraft), or

60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility).

A violation of the following section of Title 21:

960, which is section 1010A of the Controlled Substances Import and Export Act (relating to narco-terrorism).

18 U.S.C. Chapter 37 - Espionage and Censorship

792, Harboring or Concealing Persons

793, Gathering, Transmitting or Losing Defense Information
794, Gathering or Delivering Defense Information to Aid Foreign Government
795, Photographing and Sketching Defense Installations
796, Use of Aircraft for Photographing Defense Installations
797, Publication and Sale of Photographs of Defense Installations
· 798, Disclosure of Classified Information
798a, Temporary Extension of Section 794
799, Violation of Regulations of National Aeronautics and Space Administration

**12 U.S.C. § 1715w – Mortgage insurance for nursing homes, intermediate care facilities, and board and care homes**

(a) Definitions – For the purposes of this section–

(1) the term "<u>nursing home</u>" means a public facility, proprietary facility or facility of a private nonprofit corporation or association, licensed or regulated by the State (or, if there is no State law providing for such licensing and regulation by the State, by the municipality or other political subdivision in which the facility is located), for the accommodation of convalescents or other persons who are not acutely ill and not in need of hospital care but who require skilled nursing care and related medical services, in which such nursing care and medical services are prescribed by, or are performed under the general direction of, persons licensed to provide such care or services in accordance with the laws of the State where the facility is located;

(2) the term "<u>intermediate care facility</u>" means a proprietary facility or facility of a private nonprofit corporation or association licensed or regulated by the State (or, if there is no State law providing for such licensing and regulation by the State, by the municipality or other political subdivision in which the facility is located) for the accommodation of persons who, because of incapacitating infirmities, require minimum but continuous care but are not in need of continuous medical or nursing services;

(3) the term a "<u>nursing home</u>" or "<u>intermediate care facility</u>" may include such additional facilities as may be authorized by the Secretary for the nonresident care of elderly individuals and others who are able to live independently but who require care during the day; . . .

(4) the term "<u>assisted living facility</u>" means a public facility, proprietary facility, or facility of a private nonprofit corporation that--

a. is licensed and regulated by the State (or if there is no State law providing for such licensing and regulation by the State, by the municipality or other political subdivision in which the facility is located);

b. makes available to residents supportive services to assist the residents in carrying out activities of daily living, such as bathing, dressing, eating, getting

in and out of bed or chairs, walking, going outdoors, using the toilet, laundry, home management, preparing meals, shopping for personal items, obtaining and taking medication, managing money, using the telephone, or performing light or heavy housework, and which may make available to residents home health care services, such as nursing and therapy; and

c. provides separate dwelling units for residents, each of which may contain a full kitchen and bathroom, and which includes common rooms and other facilities appropriate for the provision of supportive services to the residents of the facility;

# EXHIBIT

# TWO



U.S. Department of Justice

Federal Bureau of Prisons

Washington, D.C. 20534

MAY 24 2013

MEMORANDUM FOR REGIONAL DIRECTORS
                WARDENS
                RESIDENTIAL REENTRY MANAGERS

FROM:       Blake R. Davis, Assistant Director
            Correctional Programs Division

SUBJECT:    Guidance for Home Confinement and Residential
            Reentry Center Placements

This memorandum is a compilation of previous guidance memoranda,
policy, and practices regarding home confinement and Residential
Reentry Center (RRC) placement decisions, as they relate to
current policy, practice, and changes which were necessitated by
the passage of the Second Chance Act of 2007. The intent of
this memorandum is to reemphasize and clarify established
policies and practices to facilitate effective community
placements.

I.   GUIDING PRINCIPLES FOR EFFECTIVE COMMUNITY PLACEMENTS

The Bureau's RRC resources continue to be limited and must be
focused on those inmates with the greatest need and the highest
risk of recidivism. Program Statement 7310.04, Community
Corrections Center Utilization and Transfer Procedures, requires
that RRC placements be made based on assessments of inmate needs
for services, public safety, and the necessity of the Bureau to
manage its inmate population responsibly. The Second Chance Act
emphasizes the requirement that all inmates are eligible for
pre-release RRC placement consideration and are to be assessed
on an individual basis.

An individual inmate assessment is the primary means by which we determine an inmate's need and risk level. Research indicates that inmates with low needs and a low risk of recidivating who are placed in an RRC do not benefit from the placement and could become more likely to recidivate than if they received no placement.

In accordance with the Bureau's mission to ensure public safety, each inmate must be thoroughly evaluated based upon their need for reentry services, as well as perceived risk for recidivism and risk to the community. This was previously outlined in the June 24, 2010, memorandum "Revised Guidance for Residential Reentry Center Placements," and the April 14, 2008, memorandum "Pre-Release Residential Reentry Center Placements following the Second Chance Act of 2007."[1] When contemplating an inmate's appropriateness for community placement, staff should continue to follow current policy and practice and consider public safety while determining an inmate's need for reentry services. This will help determine whether or not receiving reentry services might mitigate those public safety concerns in the long run. For example, some higher risk inmates may initially appear to be inappropriate for referral to an RRC. However, when you thoroughly weigh the potential for increased risk of recidivism of a street release versus release through an RRC, it may in fact be in the best interest of public safety to refer the inmate to the RRC.

Accordingly, every effort should be made to consider community placements for inmates with manageable medical and mental health needs. These placements can help mitigate the potential increased recidivism risk of sending an inmate with these needs directly to the community. A community placement provides more expedient access to resources to address the specialized needs of these populations. Staff must take the steps necessary to facilitate these placements.

For low need/low risk inmates, home confinement is the preferred pre-release option. This option is currently under-utilized. Program Statement 7320.01, Home Confinement, states supervision under home confinement may be provided by contract halfway house services, U.S. Probation or other government agencies.

---

1 See Sallyport, Correctional Programs Division, Correctional Programs Branch, CPB Topics "RRC"

This is normally accomplished via two home confinement options -
placement under the supervision of an RRC or placement in the
Federal Location Monitoring (FLM) program operated by U.S.
Probation, where available.  We must make a concerted effort to
utilize these effective community placement options for
appropriate inmates.  In addition to reintegrating inmates more
quickly into their communities, maximizing the use of home
confinement for appropriate inmates will help mitigate our
critical population/capacity issues.

Residential Drug Abuse Program (RDAP) graduates who successfully
complete the institution-based portion of the RDAP will continue
to be assessed for pre-release RRC placements according to the
guidance in P7430.02, Community Transitional Drug Abuse
Treatment.

Wardens and Residential Reentry Managers (RRMs) play a vital
role in ensuring an effective assessment process for inmates'
community placements.  This memorandum highlights the major
elements of an effective RRC and home confinement utilization
strategy.

## II.  MAKING AN APPROPRIATE RRC REFERRAL

As clarified in the June 2010 memoranda noted above, the Second
Chance Act states that while all inmates are statutorily
eligible for pre-release community placement, not all will be
appropriate.  Inmates must continue to be individually assessed
for their appropriateness for and the length of pre-release RRC
placements using the following five factors from 18 U.S.C. §
3621(b) and outlined in the April 2008 and June 2010 memoranda:

> (1) The resources of the facility contemplated;
> (2) The nature and circumstances of the offense;
> (3) The history and characteristics of the prisoner;
> (4) Any statement by the court that imposed the sentence:
>     (a) concerning the purposes for which the sentence to
>     imprisonment was determined to be warranted; or
>     (b) recommending a type of penal or correctional
>     facility as appropriate, and
> (5) Any pertinent policy statement issued by the U.S.
>     Sentencing Commission.

When reviewing the above factors, staff should continue to
consider the inmate's need for reentry services, public safety

~ 3 ~

concerns, and the need to responsibly manage the Bureau's inmate population.

Staff should also continue to thoroughly assess inmates' individual reentry needs when considering the appropriate duration of an RRC placement as outlined in the above referenced memoranda, current policy, and practice. A placement less than 90 days is typically not considered sufficient to address multiple reentry needs. In many cases, a placement of several months up to the maximum of one year[2] may be needed to accomplish an inmate's reentry goals. For example, an inmate with no recent employment, no GED, and poor family ties would benefit more from a one year placement than an inmate who has a short sentence, employment prospects, a high school diploma, and frequent family contacts. The number of placement days should be driven primarily by the inmate's needs and risk level (as determined by the BP-338 Custody Classification assessment or BP-337 Security Designation assessment if a BP-338 has not been completed).

The BP-338 is the Bureau's primary risk prediction instrument. Ordinarily, the lower the BP-338 score, the lower the inmate's risk; conversely, the higher the score, the higher the inmate's risk. Those with lower risks should be considered for home confinement placement and those with higher risks should be considered for RRC placement.

It is important to note that in many areas, the Bureau continues to have contracting options available to utilize the more secure environment of a Work Release Center (e.g., county jail/detention center) as a community placement. This may be the most appropriate placement option for inmates who may require closer supervision than an RRC. Institution staff should contact the applicable RRM to determine if this option is available in the area where the inmate is releasing for cases that may be deemed inappropriate for a traditional RRC.

If an inmate is truly not suitable for transfer to an RRC prior to release, staff have the option of contacting the USPO to discuss a possible public law placement wherein the judge places the individual in an RRC after their release from Bureau custody as a condition of supervised release.

---

2 See Title 18 U.S.C. § 3624(c) (1).

~ 4 ~

### III. MAKING AN APPROPRIATE REFERRAL FOR DIRECT HOME CONFINEMENT (PRE-RELEASE)

As outlined in P7320.01, Home Confinement, and per 18 U.S.C. § 3624(c)(1), all inmates are eligible for home confinement consideration at their six-month or 10 percent date. When considering an inmate for pre-release community placement, the unit team should pay special attention to reviewing low and minimum security inmates for possible direct placement on home confinement as allowed under P7320.01, Home Confinement. Higher security inmates may be considered if deemed appropriate following an individual assessment. The basic criteria for home confinement includes:

1) Appropriate release residence (e.g., positive environment free from criminal/drug use activity and a reasonable distance from the RRC, typically less than 100 miles);
2) No recent major disciplinary issues. This should be based on sound correctional judgment;
3) Any medical or mental health needs that can be met in the community and funded by the inmate or other documented resources, and
4) Secured employment is not required for placement on home confinement.

Placement should occur as close to the home confinement eligibility date as possible. The direct home confinement referral is not contingent upon USPO residence approval. A site visit should be requested during the referral process, but should not delay the submission of the referral to the RRM.

As part of their routine duties in processing inmate referrals, RRM staff will determine if placement will be via an RRC contract or FLM. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.

### IV. RRM STAFF REVIEW OF RRC/HOME CONFINEMENT REFERRALS

RRM staff will continue to thoroughly review referral documents and other pertinent information for each community placement referral. RRM staff are encouraged to maximize resources to include recommending direct placement on home confinement for appropriate inmates.

The RRM is required to review home confinement eligible inmates in RRCs every two weeks and follow-up with RRC contractors within three working days (of receipt of the biweekly status report) to ensure RRC staff have (as part of the individualized program plan for the inmate) documented an appropriate plan of action with target dates to achieve home confinement placement. This follow-up time frame is a slight reduction from the June 2010 memorandum referenced above which required a weekly review. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services. This area will be carefully reviewed for compliance during operational reviews and program reviews.

As previously indicated in the June 2010 memorandum, RRM staff will not unilaterally deny RRC referrals or reduce placement dates unless there are no available RRC beds within a reasonable distance for the specific referral date/length.

## V. COORDINATION BETWEEN INSTITUTION STAFF AND RRM/CTS STAFF

As the subject matter experts for their assigned location, RRM and Community Treatment Services (CTS) staff assist institution staff in making community placements. They provide information regarding available resources and discuss specific cases with institution staff as needed during the referral process and prior to the inmate's transfer to the RRC or placement on direct home confinement. It is important for institution and RRM staff to collaborate with CTS staff to ensure inmates with drug, mental health, or sex offender treatment needs have community-based treatment available in the vicinity of the placement.

If RRM staff have concerns regarding a referral and/or the recommended placement, they will communicate these concerns to the referring institution, typically the Case Management Coordinator (CMC).

If the RRM determines a modification to a referral is needed or that other placement options are available (such as direct home confinement for an inmate with low needs/risk or placement in a work release program for a higher security inmate), the change must be approved by the Warden. The RRM will contact the referring institution's CMC and request the recommended modification be considered. The CMC will facilitate the

~ 6 ~

Warden's review of the request and advise the RRM accordingly. Modifications can occur with the Warden's consent.

Conflicts regarding modifications to referrals should be addressed by institution management staff with the applicable Regional RRM Administrator. (Note: RRM Sector Administrators will assume this responsibility once the nationwide consolidation of RRM is completed. Contact information will be disseminated to institutions accordingly.)

If institution staff determine an inmate is not appropriate for RRC placement, the inmate's release should be carefully coordinated with U.S. Probation or Court Services and Offender Supervision Agency (for DC Code inmates). Such efforts should include the transmission of pertinent mental health and medical information and any other factors that could impact the effective reentry of the inmate to the supervising authority.

## VI. SUMMARY

- Community placements should be driven by the results of an inmate's individual assessment.
- RRC placement and length of placement decisions cannot be reduced solely to a classification score or any other type of objective categorization. While staff assessment and analysis of the Custody Classification Form (BP-338) and the ISD Plan are helpful in establishing broad-based groupings, staff must continue to exercise their professional judgment when making individual inmate RRC placement decisions and be prepared to justify those decisions. When making RRC placement decisions, staff should ensure the BP-338 and ISD Assessment have been completed accurately.
- All inmates are eligible for home confinement. Direct placement on home confinement should be considered for low and minimum security inmates. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.
- RRMs will continue to be required to review home confinement eligible inmates in RRCs on a regular basis as set forth above. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services.

o   Every effort should be made to consider community
    placements for inmates with manageable medical and mental
    health needs.  A community placement provides more
    expedient access to resources to address the specialized
    needs of these populations.  Staff must take the steps
    necessary to facilitate these placements.

Your assistance in maximizing the RRC/home confinement
utilization process is greatly appreciated.  If you have any
questions, please do not hesitate to contact me or have your
staff contact Brent Kiser, RRM Administrator, at 202-305-8906.

# EXHIBIT

# THREE



# Program Statement

OPI:    CCD
NUMBER: 7300.09
DATE:   1/12/98
SUBJECT: Community Corrections Manual

1. PURPOSE AND SCOPE.  To operate community-based corrections for offenders who are reintegrating into communities and require more supervision than traditional probation or parole, or who need an alternative to incarceration.  Community corrections is also responsible for managing Federal offenders confined in non-Bureau facilities.  Most Bureau community corrections programs are implemented through contracts and agreements with private service providers and with state or local governments.

2. PROGRAM OBJECTIVES.  The expected results of this program are:

   a. A variety of community-based correctional services and programs will be available for offenders.

   b. Contracts and budgets for community-based services and programs will be effectively managed.

   c. Offenders in community programs will receive appropriate supervision.

   d. The public will be protected from undue risk.

   e. Offenders in community programs will be provided safe living environments.

   f. Eligible inmates in community programs will have opportunities for work experiences to develop positive skills, knowledge, and work habits.

g. Inmates will be able to participate in specialized community programs such as drug, alcohol, and mental health counseling and services.

h. Positive relationships, family values, and mutual support and nurturing will be promoted and reinforced among inmates, their spouses and their children.

i. Eligible inmates will have the opportunity to develop and maintain supportive and nurturing relationships with their families through participation in their religious communities.

j. Use of intermediate punishments will contribute to proactive management of the Bureau's population.

k. Effective partnerships with governmental and private agencies, as well as the general public, will be established and maintained.

3. STANDARDS REFERENCED. Applicable standards are referenced in individual directives referenced in the Manual.

4. DIRECTIVES AFFECTED

a. Directive Rescinded

PS 7300.08    Community Corrections Manual (4/1/91)

b. Directives Referenced

PS 1010.02    Staff Meetings (1/31/95)
PS 1170.05    BOP Facts (9/4/96)
PS 1210.14    Management Control and Program Review
              (10/6/94)
PS 1280.10    Justice Telecommunications System (JUST),
              National Crime Information Center (NCIC), and
              National Law Enforcement Telecommunications
              System (NLETS), Users Guide (4/19/96)
PS 1351.04    Release of Information (12/5/96)
PS 1380.05    Special Investigative Supervisors Manual
              (8/1/95)
PS 1400.04    Contact with other Agencies and Organizations
              (9/9/96)

PS 1480.03    News Media Contacts (10/7/94)
PS 1490.03    Victim and Witness Notification (12/14/94)
PS 3420.08    Standards of Employee Conduct (3/7/96)
PS 3906.16    Employee Development Manual (3/21/97)
PS 4100.03    BOP Acquisitions (9/16/96)
PS 4400.03    Property Management Manual (2/27/96)
PS 5040.04    FBI Forms, Submission to the FBI (3/3/94)
PS 5070.10    Responses to Judicial Recommendations and
              U.S. Attorney Reports (6/30/97)
PS 5100.06    Security Designation and Custody
              Classification Manual (6/7/96)
PS 5130.05    Detainers and the Interstate Agreement on
              Detainers (2/10/94)
PS 5140.28    Unescorted Transfers and Voluntary Surrenders
              (12/9/96)
PS 5160.03    Designation of State Institution for Service
              of Federal Sentence (9/29/94)
PS 5180.04    Central Inmate Monitoring System (8/16/96)
PS 5270.07    Inmate Discipline and Special Housing Units
              (12/29/87)
PS 5326.03    Marriages of Inmates (10/29/93)
PS 5330.10    Drug Abuse Programs Manual, Inmate (5/25/95)
PS 5380.03    Cost of Incarceration Fee (COIF) (6/2/95)
PS 5550.05    Escape from Extended Limits of Confinement
              (3/27/96)
PS 5553.05    Escapes/Deaths Notification (9/17/97)
PS 5800.07    Inmate Systems Management Manual (12/24/91)
PS 5800.11    Central File, Privacy Folder and Parole
              Commission Mini-Files (9/8/97)
PS 5873.05    Release Gratuities, Transportation, and
              Clothing (9/14/96)
PS 5880.28    Sentence Computation Manual (CCCA of 1984)
              (2/21/92)
PS 5880.30    Sentence Computation Manual (Old Law, Pre-
              CCCA of 1984) (7/16/93)
PS 6000.05    Health Services Manual (9/15/96)
PS 6080.01    Autopsies, Authority to Order (5/27/94)
PS 7010.05    Interagency Agreement between the U.S. Bureau
              of Prisons (BOP) and U.S. Marshals Service
              (USMS) (12/6/93)
PS 7310.03    Community Corrections Center (CCC)
              Utilization and Transfer Procedure (3/25/96)

PS 7430.01      Drug Treatment Services, Community
                   Transitional for Inmates (1/20/95)

TRM 5301.01    SENTRY Education (6/1/94)
TRM 5801.01    SENTRY Sentence Monitoring (6/1/94)
TRM 5802.01    SENTRY General Use (6/1/94)
TRM 7000.01    Community Corrections (6/3/96)
TRM 4101.02    Procurement (6/18/97)

5. ACTION. Community corrections staff shall conduct operations and programs in accordance with policies and procedures in this Manual.

/s/
Kathleen M. Hawk
Director

_____d.  Do furlough applications have the center director's recommendation?

_____e.  Does the recommendation include documentation the USPO does not object to the furlough?

_____f.  Does the contractor maintain a record of furloughs that includes the date and time of departure, the date and time of return, and notes regarding any contacts with the resident during the furlough period?

_____g.  Is the per diem rate for residents on furlough one-half the regular per diem rate?

31.  Home Confinement:

_____a.  Is placement on Home Confinement status ordinarily recommended when an inmate has secured employment, a place to live and has demonstrated that he/she no longer requires the level of accountability and services the CCC provides.

_____b.  Does the contractor's recommendation for approval of Home Confinement cases meet the following criteria:  the resident will derive no further significant benefit from continued CCC residence; the resident has developed a release plan that has been approved by the supervising United States Probation Officer; and, the resident is not considered to present a substantial threat to the community or the safety of others?

_____c.  Does the contractor forward a written recommendation outlining the plan and a completed copy of Attachment J, Conditions of Home Confinement, to the CCM for approval?

_____d.  Do residents telephonically contact the center staff each day except when they are required to report to the center or when they have been visited by center staff?

_____e.  Do contractors further verify that residents are following the conditions of Home Confinement through random phone calls each week? (or through the use of electronic monitoring devices)

_____f.  Do staff visit residents on Home Confinement at their homes and at their places of employment at least once each week?

_____g.   Do residents on Home Confinement, who are not on electronic monitoring, return to the center at least twice each week for routine progress reviews, counseling, urine testing and other required program participation?  Do residents on electronic monitoring return to the facility at least once each week?

_____h.   Do residents on Home Confinement maintain a 9:00 PM to 6:00 AM curfew each day? (unless an exception is recommended by the contractor and approved by the CCM.)

_____i.   Are drug and alcohol testing and counseling requirements applied to residents on Home Confinement?

_____j.   Does the contractor maintain documentation of all staff contacts with residents on Home Confinement?

_____k.   Does the contractor notify the CCM immediately of any misconduct or failure of a resident on Home Confinement to comply with Home Confinement Conditions?

_____l.   Does the contractor collect subsistence from a resident on Home Confinement? (the weekly subsistence collected shall not exceed the per diem rate established for Home Confinement times seven.)

_____m.   Are offenders on probation, parole, or under supervised release supervision placed on Home Confinement only when ordered by the Court or Parole Commission to (1) "reside in or participate in the program of a community corrections facility" and to (2) participate in a Home Confinement Program?

_____n.   Does the contractor ensure that Corrections Component residents are not placed on Home Confinement unless ordered by the Court?

_____o.   Is the per diem rate for residents on Home Confinement one-half the regular per diem rate?

32.  Driving:

_____a.   Do CCC residents operate motor vehicles only when recommended by the contractor and approved by the CCM?

_____b.   Has the resident provided proof of valid insurance, driver's license, vehicle licensing and registration to the contractor?  Does the contractor maintain copies of these documents? (If the state prohibits copying, the contractor should record the driver's license number and expiration date in the resident's file.)

# EXHIBIT

# FOUR

Daniel Carpenter
90792-038
Devens Camp

Dear Captain Spaulding:                    Tuesday April 9th 2019

I need your help. I was recently
designated to the Devens Camp because I have
appeals pending in both the First Circuit - Boston
and the Second Circuit in New York and my
attorneys are primarily in Boston and Connecticut.
I completed my time on the Boston case at FPC
Canaan, but I was taken out of Canaan
and held for my trial in Connecticut at the Wyatt
Detention Center in Rhode Island. I was tried
in 2016, but not sentenced until December 3, 2018
and the Judge did not grant my motion for
Bail Pending Appeal and gave me a 30 Month Sentence.
I have been here at Devens for two weeks
and the first week was spent in the SHU where
I was not allowed to make any phone calls to my
attorneys. But my problem is that no one at
the Camp seems to understand the implications
of the First Step Act (FSA) for an over-age-60
inmate like myself (I will be 65 next month.)

Because of the Connecticut trial I did
not receive any Halfway House time or
Home Confinement time as required by 18 USC 3624(c).
For that reason the Probation Officer in

my case stated that I was owed 16
months of time served custodial credits
pursuant to 3585(b). See PSR para 201.
Basically, that is from December 28, 2015
when I was taken out of my bunk at midnight
and shipped to Brooklyn MDC and then to Wyatt
until my release date of January 27, 2017,
which is 13 months plus the 3 months of
Home Confinement that I never received from
my earlier sentence. I understand that
the month from Dec 28, 2015 to January 27, 2016
overlaps with my original sentence so that
cannot count to my new sentence — SO
I believe that I am entitled to 15 months
of credit under 3585(b). I submitted this
information to both Mr. Larkin and Mr. Pricchili (Records)
but no one has gotten back to me.

Therefore, my dilemma is that under
the FSA once you apply my custodial
credits for time served during my trial
I should be out the door — or at least
have my RRC Release Package being processed
by Philadelphia. Please let me explain

Under the FSA Elderly Offender Program my 30 month sentence is now 20 months plus 10 months of Home Confinement or Home Detention. From the 20 months, I am also entitled to 3 Months of Home Confinement (10% of 30); therefore I am now down to 17 months. Then if you subtract my 3585 (b) credits of 15 months, I am left with 60 days which minus my Good Time Credit of 54 Days means that after my 6 days in the SHU — I should have been sent home.

My fear is that every one is waiting to hear from Grand Prairie, and I could be here for months before a decision is made. Therefore, I would like your help to prepare my RRC Release Package or give me your blessing to do it in BP 10 to Philadelphia so that I can expedite the administrative remedy process. Obviously any thoughts you have on my unique situation would be very much appreciated.

Thank you for your consideration of my request. All respect, Daniel E. Carpenter 90792-038

# EXHIBIT

# FIVE

Daniel Carpenter
90792~038                          April 30, 2019

Dear Warden Spaulding:

By this letter I am officially requesting
Compassionate Release to Home Confinement
pursuant to the First Step Act. I will be 65
in May and qualify under all of the requirements
of the Elderly Offender Program under the FSA.
In addition to severe hypertension and chronic
Sleep Apnea, I need to get up 5-6 time each
night to urinate and yet Ms. Fandryer feels
it unnecessary to give me a bottom bunk.
Recently I was assigned to the Midnight Shift
at the Power House where I am forced to
sleep on the floor of the bathroom because of
the noise of the machinery. Ms. Fandryer informed
me that one is not supposed to sleep during the
midnight shift. Because of the lack of care that
I am receiving here - both for my Bi-Polar II Disorder
and my Anxiety and Stress Disorder along with
my heart condition, I am genuinely in fear of my
life based on the lack of care exhibited by Ms. Fandryer.
I have the highest regard for the medical professionals
at Canaan where I was for 3 years and for the professionals
at Wyatt that literally saved my life during a cardiac
event that was later detected by the professionals at Canaan.
At both Canaan and Wyatt I suffered from both Edema
and the worst case of Cellulitis the doctors had ever seen. I
fear both the Cellulitis and the Edema are back and I would
like to be sent to Home Confinement for the duration of my sentence.
Thank you for your thoughtful consideration of my request. Daniel Carpenter

# EXHIBIT

# SIX

BP-S148.055 INMATE REQUEST TO STAFF CDFRM
SEP 98
U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) | DATE: April 30, 2019 |
|---|---|
| Mr. Larkin | |
| FROM: Daniel Carpenter | REGISTER NO.: 90792-038 |
| WORK ASSIGNMENT: Power House | UNIT: CAMP |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.) Mr. Larkin; Please enroll me in the Elderly Offender Program
pursuant to the First Step Act, Section 603(b).

I would also appreciate your help in qualifying for the maximum
amount of Half way House time pursuant to § 3624(c), which
provides that I am entitled to at least 9 months of Halfway House
and 3 months of Home Confinement. Moreover, under 34 USC § 60541(g)
the BOP is meant to waive any limitations under 3624(c) to
accomplish the goals of the Elderly Offender Program. 60541(g)(1)(C)

Also as the FSA provides for 500 minutes of phone time each month,
and several places have already gone up to 400 minutes, I would appreciate
the Warden granting me the 500 minutes under the FSA so that I can
assist my attorneys with my appeals pending before the First Circuit and the
Second Circuit. Thank you for your help on this. Daniel E Carpenter

(Do not write below this line)                                        90792-038

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

# EXHIBIT

# SEVEN

9/9/2019   Education   Recent Program   Inmate Security
                                          Designation

Change Notice
5100.08   CN-1              OPI : CPD/CPB

Approved   Kathleen Hawk Sawyer

        Inmate Security Designation and Custody Classification
              Dated Sept 12 2006

   Nearer Release Transfers. ( Code 313 )

   Inmate Transfer   Chapter 7   Page 1    p 78
                     Chapter 7   Page 4    p 81


Mr. Noel ;  Thank you for helping me with my BP-338
at my TEAM meeting. Today, Mr. Larkin told me
to set my transfer request to you today pursuant to
Director Kathleen Hawk Sawyer's Change Notice for
5100.08 dated Sept 4 2019 which amended
Nearer Release Transfers. ( Code 313 ). See new
Inmate Transfer Chapter 7 Page 4 ( Page 81 ) of
5100.08 Dated Sept 12 2006. Because Watkinson House
in Hartford is a BOP Facility and is only 20 minutes
from my Home, I would like to use this new rule under

INMATE REQUEST TO STAFF CDFRM

U.S. DEPARTMENT OF JUSTICE                                  FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Mr. Noel Case Manager | DATE: Sept 25, 2019 |
|---|---|
| FROM: Daniel CARPENTER | REGISTER NO.: 90792-038 |
| WORK ASSIGNMENT: Power House | UNIT: CAMP |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary.  Your failure to be specific may result in no action being taken.  If necessary, you will be interviewed in order to successfully respond to your request.

Mr. Noel;    Thank you for helping me with my BP-338 at my TEAM Meeting today, Mr. Larkin told me to get my "Nearer Release Transfer" request to you today pursuant to Director Kathleen Hawk Sawyer's Change Notice for 5100.08 dated Sept 4, 2019 which amended Chapter 7 Page 4 (Page 81) of the original 5100.08 dated Sept 12, 2006. Because Watkinson House in Hartford is only 20 minutes from my Home, I would like to use the Director's new order pursuant to the First Step Act to transfer there for the remainder of my sentence, Watkinson House is a registered BOP facility, and therefore qualifies for a transfer under the FSA. Thank you for your help on this.

Daniel E. Carpenter

(Do not write below this line)

DISPOSITION:

|  |  |
|---|---|
| Signature Staff Member | Date |

Record Copy - File; Copy - Inmate

PDF                              Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER        SECTION 6